UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ZAHRA SHOKRI VARNIAB, et al.,

Plaintiffs,

v.

JOSEPH B. EDLOW, et al.,

Defendants.

Case No. 25-cv-10602-SVK

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 9

## I.    INTRODUCTION AND BACKGROUND

Plaintiffs, medical doctors who are married to each other, seek a preliminary injunction directing the Government to complete adjudication of their pending applications for permanent residency and work authorization so that they may continue on their paths to becoming practicing physicians in the United States. Plaintiffs lawfully immigrated here from Iran in March 2023 and filed the pending applications in May 2025. Since December 2025, their applications have been on hold under a new policy of the United States Citizenship and Immigration Services ("USCIS") that indefinitely holds final adjudication of applications for immigration benefits filed by persons from certain countries including Iran. For the reasons stated below, the Court **GRANTS** Plaintiffs' motion for preliminary injunction.

### A.    USCIS hold on final adjudication of pending applications for immigration benefits by applicants from Iran and other countries

On December 2, 2025, USCIS issued Policy Memorandum PM-602-0192 ("PM-0192"), with the subject line: "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries." Dkt. 8-1. PM-0192 places an "adjudicative hold" on a wide range of pending requests for immigration benefits filed by aliens from a list of 19 countries including Iran. *See id.* at 1, 2-3. "This hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum." *Id.* at 2-3. USCIS issued a second Policy Memorandum on January 1, 2026 ("PM-0194"), with the subject line "Hold and

United States District Court
Northern District of California

Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries," which stated that the guidance in PM-0192 remained in place and further explained that the "hold" on benefit applications "allows a case to proceed through processing, up to a final adjudication," *i.e.,* "the issuance of a final decision in a case, such as an approval, denial, or dismissal." PM-0194 at 1, 2, and n. 2.[1]

PM-0192 refers to an executive order ("EO 14161") issued by President Trump on January 20, 2025, the first day of his second term, entitled "Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats." Dkt. 8-1 at 2; *see also* Dkt. 24-1 (Corrected Certified Administrative Record) at CAR000015-CAR000017. As characterized by PM-0192, EO14161 "underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests." Dkt. 8-1 at 2. PM-0192 also refers to Presidential Proclamation 10949 (the "Proclamation"), entitled "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats," which was issued by President Trump on June 4, 2025. *Id.* at 1 n.1; *see also* Dkt. 24-1 at CAR000018-CAR000026. PM-0192 states that "[e]xercising authority under section 212(f) of the Immigration and Nationality Act ("INA"), the proclamation imposes restrictions, limitations, and exceptions on the entry of aliens from 19-high risk countries." Dkt. 8-1 at 1 n.1. Iran is one of the 19 countries listed in the Proclamation. Dkt. 24-1 at CAR000021.

**B.    Plaintiffs Varniab and Langroudi**

Among the people impacted by the adjudication hold instituted under PM-0192 are Plaintiffs Zahra Shokri Varniab and her husband, Ashkan Pourabhari Langroudi. As Iranian nationals, Plaintiffs are subject to the adjudication hold under PM-0192. Both Plaintiffs are graduates of Tehran University of Medical Sciences who have worked as physicians in Iran.

---

[1] The First Amended Complaint in this case focuses primarily on PM-0192, but it also mentions the second Policy Memorandum (PM-0194), Dkt. 8 ¶ 52, and Defendants discuss PM-0194 in their opposition to the motion for preliminary injunction, Dkt. 21 at 6, 14, 21, and n.2. PM-0194 is available at https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0194-PendingApplicationsAdditionalHighRiskCountries-20260101.pdf (last visited February 19, 2026).

Dkt. 29-1 (Second Varniab Decl.) ¶¶ 3-6; Dkt. 29-2 (Second Langroudi Decl.) ¶¶ 3-4. Both aspire to continue their medical careers in the United States: Varniab as a practicing radiologist and Langroudi in academic medicine. Dkt. 29-1 ¶ 8; Dkt. 29-2 ¶ 7.

As Varniab's professional interests and goals developed, she identified a laboratory at the Stanford School of Medicine that aligned with her skills and interests. Dkt. 29-1 ¶ 6. Plaintiffs legally entered the United States on valid J-1 (for Varniab) and J-2 (for Langroudi) visas on March 6, 2023. Dkt. 8 (First Amended Complaint or "FAC") ¶ 43; Dkt. 29-1 ¶ 7; Dkt. 29-2 ¶ 5. Starting shortly thereafter and continuing until present, Varniab has worked at the Stanford School of Medicine as a postdoctoral research fellow. Dkt. 29-1 ¶ 7. Since October 2023, Langroudi has worked as a visiting instructor and researcher for the Stanford urology department. Dkt. 29-2 ¶ 6.

The next step on Varniab's path to becoming a licensed and certified physician in the United States is to apply for a diagnostic radiology residency, which typically offers five to six years of additional training. Dkt. 29-1 ¶ 8. She has already begun the intensive process of preparing for the "Match Day" operated by the National Residency Match Program ("NRMP") by taking exams and undergoing other preparation. *Id.* ¶¶ 8-11. NRMP analyzes rank order lists from both applicants and residency programs and releases final placements on Match Day, which this year will take place on March 20, 2026. *Id.* ¶¶ 10-12. Varniab expects that if she matches with a residency program on Match Day, within days to a couple of weeks she will need to sign an employment contract, which in turn will require her to have work authorization either through an Employment Authorization Document ("EAD") or lawful permanent residency. *Id.* ¶ 13. Her current J-1 research visa cannot be used for this purpose. *Id*. Meanwhile, Langroudi's current EAD expires on March 31, 2026, after which time he will not be able to continue in his current Stanford appointment or pursue new employment in the United States. Dkt. 29-2 ¶ 7.

Plaintiffs began taking the necessary steps to obtain permanent resident status and EADs many months before these approaching deadlines. On May 2, 2025, USCIS approved Varniab's EB-1A petition (Alien Worker with Extraordinary Ability). FAC ¶ 46. On May 12, 2025, Plaintiffs each submitted a Form I-765 (Application for Employment Authorization) and Form I-485 (Application to Register Permanent Residence or Adjust Status) to USCIS. *Id.* ¶ 47. Plaintiffs attended appointments for biometrics screening on May 27, 2025 (*id.* ¶ 48), but between

3

that date and the filing of this lawsuit on December 11, 2025, Plaintiffs received no updates, requests for evidence, or additional information from USCIS, despite multiple attempts by Plaintiff Varniab to expedite her application. *Id.* ¶¶ 48-49.

### C. Procedural background

On December 11, 2025, Plaintiffs filed this action to compel USCIS to adjudicate their applications. Dkt. 1. Plaintiffs filed the FAC on January 1, 2026. Dkt. 8. Named as Defendants are Joseph B. Edlow, Director of USCIS; Kristi Noem, Secretary of Homeland Security; and Pamela Bondi, the Attorney General of the United States. *Id.* ¶¶ 21-23. All Parties have consented to the jurisdiction of a magistrate judge. Dkt. 6, 16.

On January 3, 2026, Plaintiffs filed the motion for preliminary injunction now before the Court, in which they seek to compel Defendants to adjudicate their Form I-765 and Form I-485 applications within 30 days of issuance of the Court's order. The motion is fully briefed. Dkt. 9-1 (motion), Dkt. 21 (opposition), Dkt. 22 (reply).

On January 22, 2026, the day before Defendants' opposition to Plaintiffs' motion for preliminary injunction was due, USCIS took the first action on Plaintiffs' applications in nearly eight months when it scheduled their interviews for February 5, 2026. Dkt. 21 at 7; Dkt. 21-1 (Declaration of Hannah Lam) ¶ 6. In an update filed on February 7, 2026, Plaintiffs confirmed that the interviews took place as scheduled. Dkt. 26-1 (First Langroudi Decl.) ¶ 2.[2]

The Court granted Plaintiffs' motion to compel Defendants to produce the Administrative Record concerning PM-0192 before the hearing on the motion for preliminary injunction, and Defendants thereafter filed the Certified Administrative Record. Dkt. 20; Dkt. 24-1 (Corrected Certified Administrative Record or "CAR").

The Court held an in-person hearing on February 10, 2026. *See* Dkt. 34 (2/10/26 Hrg. Tr.).

---

[2] Plaintiffs' February 7, 2026 update stated that on January 30, 2026, USCIS responded to a January 21, 2026 inquiry from Plaintiff Langroudi regarding the status of his pending Form-765 application for employment authorization by informing him that the application had been approved. Dkt. 26 at 2. Plaintiffs' update stated that he had not yet received his approval notice in the mail and that USCIS's website indicated that his case was still being processed. *Id.* Defendants informed the Court at the hearing that Langroudi's inquiry and USCIS's response concerned a different Form I-765 than the one now at issue in this case. Dkt. 34 (2/10/26 Hrg. Tr.) at 6:2-12. Defendants have consistently taken the position that final adjudication of the relevant I-485 and I-765 applications by Plaintiffs is on hold pursuant to PM-0192. *See* Dkt. 21 at 7.

After hearing extensive argument, the Court ordered both sides to provide additional briefing on the applicable statutory scheme. *See* Dkt. 27. The Court also ordered Plaintiffs to submit declarations providing more information about their current employment status and the basis for Varniab's eligibility to participate in the 2026 Match Day. *Id.* The Parties have submitted those additional materials. Dkt. 28 (Plaintiffs' statement regarding statutory scheme), Dkt. 31 Defendants' statement regarding statutory scheme); Dkt. 29 (Plaintiffs' additional declarations).

After carefully considering the facts and arguments set forth in the filings in this case, the arguments at the hearing, and the relevant law, the Court **GRANTS** Plaintiffs' motion for preliminary injunction for the reasons discussed below.

## II.     LEGAL STANDARD

### A.     MOTION FOR PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Its purpose is to maintain the "status quo ante litem"—that is, "the last uncontested status which preceded the pending controversy"— pending a decision on the merits. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (finding "status quo ante litem" in trademark infringement suit "existed before [the defendant] began using its allegedly infringing logo") (internal quotation marks and citation omitted).

To obtain a preliminary injunction, Plaintiffs must establish that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. A showing on all four *Winter* factors is required. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). However, the Ninth Circuit takes a "sliding scale" approach, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131; *see also Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 843–44 (9th Cir. 2024). Specifically, "a preliminary injunction may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable

injury and that the injunction is in the public interest.'" *Planned Parenthood,* 122 F.4th at 844

(quoting *Cottrell*, 632 F.3d at 1135).

**B.    RELEVANT FRAMEWORK FOR ADJUSTMENT OF STATUS AND EMPLOYMENT AUTHORIZATION UNDER THE IMMIGRATION LAWS**

This discussion of the legal framework for adjustment of status and employment

authorization draws primarily from the supplemental brief submitted by Defendants, but the

Parties are largely in agreement on the statutory and regulatory framework.  *See* Dkt. 28

(Plaintiffs' supplemental statement); Dkt. 31 (Defendants' supplemental statement).  The

Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, authorizes certain individuals

to apply for immigrant visas or lawful permanent resident status through employment-based

("EB") categories.  *See* 8 U.S.C. § 1151(a)(2).  Within the EB classification, there are five visa

preference categories, 8 U.S.C. § 1153(b)(1)-(5), and each category is allocated a certain number

of annual immigrant visas by Congress, § 1151(d).  One of these preference categories provides

for visas for aliens with extraordinary ability, EB-1A visas.  *See* 8 U.S.C. § 1153(b)(1)(A).  "Any

alien desiring to be classified under [EB-1A]. . . may file a petition with the Attorney General for

such classification."  8 U.S.C. § 1154(a)(1)(E)-(H). [3]  "The EB-1A immigrant process is first

initiated when the noncitizen files Form I-140 with USCIS."  FAC ¶ 28 (citing 8 C.F.R.

§ 204.5(a)).

An EB-1A immigrant can apply to adjust their status to lawful permanent resident using

Form I-485, Application to Register Permanent Residence or Adjust Status, based on a pending or

approved immigrant petition and if certain threshold requirements are met. 8 U.S.C. § 1255(a);

*see also* 8 C.F.R. § 245.2(a)(2)(i)(B) (providing for the concurrent filing of an adjustment of status

application with certain employment-based immigrant petitions).  The spouse of the EB-1A

immigrant can also file a Form I-485 application as a derivative applicant of the primary EB-1A

applicant. *See* 8 U.S.C. § 1153(d) ("A spouse . . . shall, if not otherwise entitled to an immigrant

status and the immediate issuance of a visa under subsection (a), (b), or (c), be entitled to the same

---

[3] Many provisions of the INA refer to the Attorney General, but according to Defendants and not disputed by Plaintiffs, most of the functions exercised under the INA have been transferred to the Secretary of Homeland Security.  Dkt. 31 at PDF p. 2 n.2.

status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse[.]").

USCIS engages in a multi-step process when evaluating an application for adjustment of status. Section 1255(a) provides:

> The status of an alien who was inspected and admitted . . . into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a); *see also* 8 C.F.R. § 245.1(a).

An applicant for adjustment of status may also apply for employment authorization. 8 C.F.R. § 274a.12(c)(9).

J-1 principal and J-2 dependent visas are non-immigrant visas for individuals who are participating in a training program here but do not intend to abandon their residence outside of the United States. *See* 8 U.S.C. § 1101(a)(15)(J). Employment authorization as a J-1 principal nonimmigrant or J-2 dependent is different than employment authorization based on a pending adjustment of status application. Employment authorization for principal J-1 nonimmigrants is incident to status (it does not require separate application) and is limited in that it only authorizes employment for, and consistent with, the J-1 nonimmigrant's designated training program. 8 C.F.R. § 274a.12(b)(11). Employment authorization for J-2 dependents may be granted under 8 C.F.R. § 274a.12(c)(5) and "authorize[s] the holder of the Employment Authorization Document ('EAD') to work for any U.S. employer without restriction during the validity of the EAD card." Dkt. 31 at PDF p. 3.

////

////

////

////

////

### III.    DISCUSSION

### A.    Subject Matter Jurisdiction

Defendants argue that 8 U.S.C. § 1252(a)(2)(B) strips the Court of subject matter jurisdiction over this case.  Dkt. 21 at 9-14.  8 U.S.C. § 1252 is entitled "Judicial review of orders of removal" and provides, in relevant part:

> **(a) Applicable provisions**
>
> **(1) General orders of removal**
> Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 1225(b)(1) of this title) is governed only by chapter 158 of Title 28, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.
>
> **(2) Matters not subject to judicial review**
> …
> **(B) Denials of discretionary relief**
> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> (i)    any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title,[4] or
>
> (ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

28 U.S.C. § 1252.

The Parties disagree about whether section 1252 applies in this case, where it is undisputed that there is no final order or judgment on Plaintiffs' applications for immigration benefits and which arises in a non-removal context.  *See* Dkt. 21 at 21 (statement that "USCIS has yet to issue

---

[4] This subsection cross-references various forms of relief available to non-citizens, including adjustment of status (8 U.S.C. § 1255).

any decision (approval or denial)" and "has not reached any final determination" on any applications subject to PM-0192 hold). The Court now turns to the Parties' specific arguments as to whether subsections 1252(a)(2)(B)(i) or (B)(ii) strip the Court of jurisdiction.

### 1. 8 U.S.C. § 1252(a)(2)(B)(i)

Defendants first argue that the Court is stripped of subject matter jurisdiction under subsection 1252(a)(2)(B)(i). Dkt. 21 at 9-10. Plaintiffs argue that this subsection does not apply for two reasons: "Plaintiffs are not defending against removal and have not received removal orders, and Plaintiffs have not received denials on their adjustment of status applications." Dkt. 22 at 2.

Taking Plaintiffs' second argument first, they contend that Defendants' argument that subsection (B)(i) applies in this case, where there has not been a judgment, is inconsistent with language in that subsection that only expressly bars judicial review of any "judgment" regarding the granting of relief under the enumerated statutes. *Id.* at 3. In opposition, Defendants cite cases including *Patel v. Garland*, 596 U.S. 328 (2022) and *Zia v. Garland*, 112 F.4th 1194 (9th Cir. 2024) for the proposition that subsection (B)(i) bars review not only of last-in-time judgments but also of "[a]ny factual findings or decisions that are made during Plaintiffs' I-485 decisions." Dkt. 21 at 10. At the hearing, Defendants cited the Ninth Circuit's decision in *Garcia v. USCIS*, 146 F.4th 743 (9th Cir. 2025), a case not cited in their brief, as additional support for this proposition. Dkt. 34 (2/10/26 Hrg. Tr.) at 14:23-22:6. In that case, the Ninth Circuit stated that "broad" language of subsection (B)(i) covers "any judgment of whatever kind, and, through the term 'regarding,' not just the granting of relief[,] but also any judgment *relating to* the granting of relief." *Garcia*, 146 F.4th at 748 (quoting *Patel*, 596 U.S. at 338-39) (emphasis in original, internal quotation marks omitted). Defendants are therefore correct that section 1252(a)(2)(B)(i)'s bar on judicial review applies more broadly than a final judgment or decision on an immigration-related application.

However, the cases upon which Defendants rely each involved the question of whether courts have jurisdiction to review factual findings and other preliminary decisions made in connection with final decisions on individual applications for immigration benefits. *See Patel*, 596 U.S. at 338 (holding that subsection (B)(i) prohibited judicial review of factual findings that

were the basis of the immigration judge's denial of application for adjustment of status and issuance of removal order); *Zia*, 112 F.4th at 1201 (holding that court did not have jurisdiction to review decision on a good faith marriage waiver and any underlying determination of plaintiff's eligibility which resulted denial of petition to remove conditional bass of permanent resident status); *Garcia*, 146 F.4th at 747, 751 (holding that court did not have jurisdiction to review challenge to USCIS's authority to require medical examinations for certain applicants for adjustment of status where plaintiff's application had been denied). Those cases are distinguishable from this one, where Plaintiffs do not seek review of any "factual findings or decisions" made in connection with a decision on their applications. They instead seek review of Defendants' *failure to decide* their applications pursuant to the adjudication hold under PM-0192.

In another recent decision, cited by Plaintiffs at the preliminary injunction hearing (Dkt. 34 at 23), the Ninth Circuit concluded that "§ 1252(a)(2)(B)(i) does not categorically strip federal district courts of jurisdiction" to hear claims that "challenge generally applicable agency policies without referring to or relying on denials of individual applications for relief." *Nakka v. USCIS*, 111 F.4th 995, 999 (9th Cir. 2024); *see also id*. at 1009. As the Ninth Circuit explained in its subsequent decision in *Garcia*, "*Nakka* [] concluded that Congress clearly indicated that it did not intend § 1252(a)(2)(B)(i) to preclude district court jurisdiction over collateral policy and procedure claims when not made in connection with a challenge to the denial of individual discretionary relief." *Garcia*, 146 F.4th at 749 (internal quotation marks and citations omitted). The Ninth Circuit held in both *Nakka* and *Garcia* that it could not hear such "collateral" claims by the particular plaintiffs in those cases. In *Nakka*, a putative class action challenging a USCIS policy relating to visa retrogression, "only one of the named Plaintiffs filed an application for adjustment of status." *Nakka,* 111 F.4th at 1010. The Ninth Circuit held that the "non-filing" plaintiffs did not have ripe claims. *Id.* at 1010-11. Although the one "filing" plaintiff had a ripe claim, the court lacked jurisdiction for a different reason: her application for adjustment of status had been denied, so under 8 U.S.C. § 1252(a)(2)(D) her challenge was "channeled" into a different, more limited review process. *Id.* at 1012, 1014-15. The plaintiff in *Garcia* fell into the same category as the one "filing" plaintiff in *Nakka* because USCIS had denied her application for adjustment of status. *Garcia,* 146 F.3d at 751. Here, however, Plaintiffs fall into a third category not at issue in

*Nakka* or *Garcia*:  they have filed petitions for adjustment of status but USCIS has not decided the petitions (and will not do so) because of the adjudication hold policy.  Under these circumstances, subsection (B)(i) does not strip the Court of jurisdiction.

Turning to Plaintiffs' second argument as to why section 1252(a)(2)(B)(i) does not apply, they contend that section 1252(a)(2)(B) only bars jurisdiction in the context of removal proceedings.  Dkt. 22 at 2-3, 5.  Plaintiffs are correct that unlike this case, both *Patel* and *Zia* involved removal proceedings.  *Id.* at 3, 5; *see also Patel*, 596 U.S. at 333-35 (explaining procedural history of Patel's appeal of order of removal); *Zia,* 112 F.4th at 1197-98 (explaining procedural history of Zia's appeal of denial of request during removal proceeding to remove conditional basis of permanent resident status).  Moreover, in *Patel*, the Supreme Court expressly stated that the reviewability of USCIS decisions outside the removal context was not before the court and declined to decide that issue.  *Patel*, 596 U.S. at 345.  However, the Ninth Circuit recently held that " § 1252(a)(2)(B)(i) precludes district court review of challenges to USCIS adjustment of status determinations made outside the context of removal proceedings."  *Garcia*, 146 F.4th at 749; *see also Nakka*, 111 F.4th at 1014 ("Although it is a close question … we conclude that 'relief under section … 1255' refers generally to adjustment of status, whether the applicant is seeking relief from renewal or not").

The Court concludes that section (B)(i) does not strip it of jurisdiction in this case. It reaches this conclusion not because this case arises in a non-removal context, but because Plaintiffs do not seek review of any final decision, or any subsidiary or preliminary decisions or factual findings, on their applications for immigration benefits.  They instead seek review of Defendants' failure to issue a decision on their applications because of the adjudication hold policy set forth in PM-0192.

### 2.      8 U.S.C. § 1252(a)(2)(B)(ii)

Defendants next argue that under section 1252(a)(2)(B)(ii), the Court lacks jurisdiction because Plaintiffs seek review of discretionary decisions or actions.  Dkt. 21 at 10-14.  The crux of Defendants' argument is that the decision to place a hold on the adjudication of immigration benefit applications from certain applicants, as reflected in PM-0192, is an unreviewable discretionary decision.  *Id.*

An overarching problem with Defendants' argument is that numerous courts have concluded that subsection (B)(ii) only precludes judicial review of decisions denying discretionary relief on individual applications and does not preclude judicial review of the Government's decision to categorically act or withhold action. *See, e.g., Miot v. Trump,* -- F. Supp. 3d --, 2026 WL 266413, at * 17 (D.D.C. Feb. 2, 2026) (holding that "Subsection (a)(2)(B)(ii) poses no barrier to the Court's review" of decision of DHS Secretary to terminate Temporary Protected Status designation for Haiti); *Doe v. Noem*, 778 F. Supp. 3d 311, 332 (D. Mass. 2025), *vacated and remanded on other grounds*, 152 F.4th 272 (1st Cir. 2025) (holding that "categorical actions challenged here," which were decisions to terminate parole program for aliens from certain countries, were not precluded from judicial review by subsection (B)(ii)).

Defendants cite several out-of-circuit cases for the proposition that "multiple courts have held that USCIS's decision to hold adjudication on adjustment of status applications is the kind of discretionary decision that cannot be reviewed under § 1252(a)(2)(B)(ii)." Dkt. 21 at 11 (citing *Kale v. Alfonso-Royals*, 139 F.4th 329, 336 (4th Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 394 (5th Cir. 2024); *Thigulla v. Jaddou*, 94 F.4th 770, 776-78 (8th Cir. 2024); *Geda v. USCIS*, 126 F.4th 844 (2024); *Kanapuram v. USCIS*, 131 F.4th 1306, 1306-07 (11th Cir. 2025); *Beshir v. Holder*, 10 F. Supp. 3d 165, 174 (D.D.C. 2014); *Orlov v. Howard*, 523 F. Supp. 2d 30, 35 (D.D.C. 2007)).

Most of these cases (*Kale, Cheetaji, Thigulla, Geda*, and *Kanapuram*) involved the "retrogression hold" policies of the State Department and USCIS to hold in abeyance applications for adjustment of status until one of a limited number of annual visas became available. Defendants assert that "[t]he present case is functionally indistinguishable from visa retrogression cases," but visa retrogression stands on a different factual and legal footing than the adjudication hold implemented under PM-0192. Defendants acknowledge that under the retrogression hold policies, "USCIS placed adjustment applications on hold until a condition precedent was satisfied—availability of a visa number—and in some cases those holds lasted for years." Dkt. 21 at 12 (citing *Gupta v. Jaddou*, 118 F.4th 475 (1st Cir. 2024)). Here, by contrast, Defendants have not identified the "condition precedent" for the PM-0192 adjudication hold to be lifted, and no end point is apparent from the Policy Memorandum itself. *See* (2/10/26 Hrg. Tr.) at 8:21-25

(statement by Government counsel: "So applications that are subject to this hold would still go through all of those processes, until they are ready for the final decision, and then that's where they would be held, and then we're looking for further guidance as to kind of what to do at that point"); *see also* Dkt. 21 at 21 ("aliens' applications remain pending" during USCIS's "ongoing work" to "develop[] enhanced security review protocols").

Moreover, the retrogression hold policies have different statutory and regulatory underpinnings than USCIS's new policy of holding final adjudication of certain applications pursuant to PM-0192. Of note, the retrogression hold policy finds support in 8 C.F.R. § 245.2(a)(5)(ii), which provides that certain applications for adjustment of status "shall not be approved until an immigrant visa number has been allocated by the Department of State." *See Babaria v. Blinken*, 87 F.4th 963, 972 (9th Cir. 2023). Defendants have not identified any analogous statute or regulation that specifically authorizes the adjudication hold under PM-0192.

Thus, Defendants cannot successfully extrapolate from the visa retrogression cases a general principle that USCIS has unfettered discretion to impose adjudicatory holds.

The two non-retrogression cases cited by Defendants for the proposition that "USCIS's decision to hold adjudication on adjustment of status applications is the kind of discretionary decision that cannot be reviewed under § 1252(a)(2)(B)(ii)" (Dkt. 21 at 11)—*Orlov* and *Beshir*— are also distinguishable. As a later case described it, *Orlov* "concerned applications for adjustment of status that were under active (though deliberate) consideration at the time of suit" and stood in contrast to a case in which an application for adjustment of status had been "formally placed on hold." *Geneme v. Holder*, 935 F. Supp. 2d 184, 190 (D.D.C. 2013) (holding that section 1252 "does not specify that USCIS shall have discretion to decide whether and when to adjudicate applications for adjustment of status"). Here, unlike in *Orlov*, Plaintiffs' applications are not merely being processed slowly; final adjudication is on hold.

*Beshir* involved a petition for adjustment of status that was placed on hold under a USCIS policy, but the factual circumstances of the hold are sharply distinguishable from those surrounding the adjudication hold of Plaintiffs' applications in this case. In *Beshir*, the applicant's Form I-485 application was denied because she was found to have "engaged in a terrorist activity" and was thus inadmissible. 10 F. Supp. 3d at 168. USCIS subsequently granted the applicant's

motion to reopen her adjustment application and placed it on hold pursuant to a new USCIS policy that instructed the withholding of adjudication of cases that could potentially benefit from a regulatory expansion of the authority to exempt certain groups (including a group the plaintiff supported) from terrorism-related inadmissibility grounds. *Id.* The situation in that case thus involved an applicant whose Form I-485 application had already been denied but was reopened and placed on hold because "USCIS determined that [she] may *benefit* from a future exemption." *Id.* (emphasis added). That is quite different from the situation faced by Plaintiffs here, involving an indefinite hold on any initial decision on their Form I-485 applications until Defendants develop a new process for imposing additional requirements for applicants from Iran and other countries deemed to be "high-risk." Dkt. 8-1 at 2.

In any event, "the majority of district courts" in the Ninth Circuit have refused to follow *Beshir* and other cases that have concluded that the pace of adjudication is discretionary and thus not subject to judicial review, instead holding that "the government has a non-discretionary duty to adjudicate [petitions for adjustment of status] within a reasonable period of time" and that courts have jurisdiction to review the Government's failure to do so. *Khan v. Johnson*, 65 F. Supp. 3d 918, 924-25 and n. 4 (C.D. Cal. 2014) and cases cited therein; *see also Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1069 (N.D. Cal. 2014) ("Indeed, the government has a non-discretionary duty to adjudicate [petition for adjustment of status] within a reasonable period of time" and "[t]o hold otherwise would be to sanction the perpetual delay of governmental obligations that are clearly mandated by law" (internal quotation marks and citations omitted)); *Mugomoke v. Curda*, No. 2:10-CV-02166 KJM DAD, 2012 WL 113800, at *4 (E.D. Cal. Jan. 13, 2012) ("While the Secretary has discretion to decide the outcome of an I–485 application, the authority to not act on an application is not conferred by any statute. Thus a failure to act on an I–485 application falls within the APA's default rule: 'With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.' (citing 5 U.S.C. § 555(b)).

The Court next specifically addresses the three sources of discretion specifically identified by Defendants as being relevant here: (1) 8 U.S.C. § 1255; (2) 8 C.F.R. § 103.2(b)(18); and (3) the absence of a statutory timeline for the adjustment of status. *Id.* at 10-13.

### a.    8 U.S.C. § 1255(a)

Defendants argue that decisions regarding adjustment of status are discretionary under 8 U.S.C. §1255(a). Dkt. 21 at 10. As discussed in section II.B. above, that section provides that the Attorney General may adjust the status of specified aliens to that of an alien lawfully admitted for permanent residence if certain requirements are met. 8 U.S.C. § 1255(a).

Although the text of the statute supports Defendants' argument that the decision whether to grant adjustment of status is discretionary, Defendants attempt to extend their argument by asserting that "[t]his statutory language confers broad discretion upon the Secretary to determine not only *whether* to grant adjustment of status, but also *how* and *when* to adjudicate such applications." Dkt. 21 at 10 (emphasis in original). Notably, Defendants' brief does not cite any authority for this assertion. In fact, Defendants' argument is directly contradicted by many cases holding that neither section 1255(a) nor any other statute provides discretionary authority over the pace of adjudicating applications. In *Wang v. Chertoff*, for example, another district court in the Ninth Circuit rejected the Government's argument that section 1255(a) insulated USCIS's failure to act on Form I-485 applications within a reasonable time from judicial review, noting that "dozens (if not hundreds) of district courts" had considered the issue of whether courts have jurisdiction over challenge to pace of adjudicating immigration applications, with "the clear majority of district courts within the Ninth Circuit" and "the majority of district courts nationwide" having concluded that §1252(a)(2)(B)(ii) does not bar judicial review. 550 F. Supp. 2d 1253, 1256-57 (W.D. Wash. 2008) (citing cases). *Wang* concluded that "courts in the Northern District of California have been unanimous in reaching the same conclusion." *Id.* at 1257 (citing cases); *see also Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1163 (N.D. Cal. 2007) (noting split in authority regarding whether "section 1252 read in conjunction with section 1255" precluded judicial review over pace-of-processing claims but concluding that jurisdiction exists, noting that "[t]his issue has come before the Northern District of California at least nine previous times in recent months (ten if an analogous examination of an I–130 application is counted), and in each instance, the position advanced by the government has been rejected and an obligation to process such applications in a reasonable period of time has been found").

15

### b. 8 C.F.R. § 103.2(b)(18)

Defendants argue that the Secretary has exercised discretionary authority "through regulations that explicitly authorize holds during investigations," citing 8 C.F.R. § 103.2(b)(18). Dkt. 21 at 10. That regulation provides:

> Withholding adjudication. USCIS may authorize withholding adjudication of a visa petition or other application if USCIS determines that an investigation has been undertaken involving a matter relating to eligibility or the exercise of discretion, where applicable, in connection with the benefit request, and that the disclosure of information to the applicant or petitioner in connection with the adjudication of the benefit request would prejudice the ongoing investigation. If an investigation has been undertaken and has not been completed within one year of its inception, USCIS will review the matter and determine whether adjudication of the benefit request should be held in abeyance for six months or until the investigation is completed, whichever comes sooner. If, after six months of USCIS's determination, the investigation has not been completed, the matter will be reviewed again by USCIS and, if it concludes that more time is needed to complete the investigation, adjudication may be held in abeyance for up to another six months. If the investigation is not completed at the end of that time, USCIS may authorize that adjudication be held in abeyance for another six months. Thereafter, if USCIS determines it is necessary to continue to withhold adjudication pending completion of the investigation, it will review that determination every six months.

Defendants' argument that this regulation gives them discretion to indefinitely hold adjudication of Plaintiffs' applications fails for several reasons. First, Defendants offer no evidence that they have undertaken an "investigation" regarding Plaintiffs' eligibility of the type contemplated by 8 C.F.R. § 103.2(b)(18). Defendants admit that adjudication of Plaintiffs' applications is on hold due to PM-0192 (Dkt. 21 at 7), which is a categorical hold rather than a hold due to an investigation of Plaintiffs personally.

Second, "8 C.F.R. § 103.2(b)(18) specifically imposes a non-discretionary duty 'with a framework for both the timing and manner of withholding adjudication of adjustment of residency status.'" *Mugomoke*, 2012 WL 113800, at *5 (quoting *Dong,* 513 F. Supp. 2d at 1166). That section "is not a blanket authority to indefinitely withhold adjudication for adjustment of status." *Dong*, 513 F. Supp. 2d at 1168. "Section 103.2(b)(18) allows for the withholding of adjudication, for specified intervals, upon compliance with specific procedural requirements," and "[a]bsent such compliance, judicial review is not precluded." *Id.*

Third, 8 C.F.R. § 103.2(b)(18) must be read in conjunction with other relevant statutes and

16

regulations. For example, 5 U.S.C. § 555(b) requires that an agency shall conclude a matter presented to it "within a reasonable time." 8 C.F.R. § 245.2(a)(5)(i) states that an I–485 applicant "shall be notified of the decision of the director and, if the application is denied, the reasons for denial." "Under either the default rule of § 555(b) or a non-discretionary duty imposed by 8 C.F.R. § 245.2(a)(5)(i) and 8 C.F.R. § 103.2(b)(18), the USCIS has a duty to decide I–485 applications." *Mugomoke*, 2012 WL 113800, at *5; *see also Gianni v. Curda,* No. 2:07–cv–1478 GEB KJM, 2008 WL 479991, at *2 (E.D. Cal. Feb.19, 2008). "Section 1252(a)(2)(B)(ii) does not withdraw the Court's jurisdiction to compel Defendants to make a decision if that decision is unlawfully withheld." *Mugomoke*, 2012 WL 113800, at *5 (citing 5 U.S.C. § 706(1)).

Fourth, because 8 C.F.R. § 103.2(b)(18) is a regulation, not a statute, it does not insulate USCIS's hold policy from judicial review under 8 U.S.C. § 1252(a)(2)(B)(ii). By its terms, subsection (B)(ii) concerns only statutory (not regulatory) bases for discretion. "[B]oth clauses [of § 1252(a)(2)(B)] convey that Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." *Kucana v. Holder,* 558 U.S. 233, 247 (2010); *Mugomoke*, 2012 WL 113800, at *4 ("the authority to not act on an application is not conferred by any statute"); *Wang*, 550 F. Supp. 2d at 1258 (regulation at issue "has no relevance in the court's discussion of the applicability of § 1252(a)(2)(B)(ii), which concerns only *statutory* bases for discretion" (citing *Spencer Enters. Inc. v. United States,* 345 F.3d 683, 691 (9th Cir. 2003) (emphasis in original)). As the Supreme Court recognized in *Kucana*, reading section 1252(a)(2)(B)(ii) to bar judicial review of administrative decisions made discretionary by regulation "would free the Executive to shelter its own decisions … simply by issuing a regulation declaring those decisions 'discretionary.'" 558 U.S. at 830.

### c. Absence of statutory timeline

Defendants argue that "[w]here Congress intends to require timely adjudication, it says so explicitly," whereas here "Congress has not imposed any statutory timeline for USCIS to adjudicate adjustment of status applications." Dkt. 21 at 12-13. Defendants argue the absence of an explicit timeline for adjustment of status "confirms that Congress intended to leave the timing of such adjudications to the agency's discretion." *Id.* at 13. The Court rejects this argument for

the reasons discussed in section III.B.1.a. of this order and finds that Defendants have a non-discretionary duty to decide Plaintiffs' applications within a reasonable time.

### 3. Conclusion on subject matter jurisdiction

For the reasons discussed, the Court concludes that it has subject matter jurisdiction. This conclusion is consistent with the "well-settled" and "strong" presumption in favor of judicial review of administrative action, *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020), which courts "consistently" apply to "legislation regarding immigration," *Kucana*, 558 U.S. at 251.

## B. Preliminary Injunction

Plaintiffs have demonstrated that the four factors for issuance of a preliminary injunction are satisfied. *See Winter*, 555 U.S. at 20.

### 1. Likelihood of success

Plaintiffs frame their challenge to the adjudication hold under PM-0192 in various ways, arguing that the hold policy violates Defendants' duty to adjudicate immigration benefit applications, is arbitrary and capricious, did not comply with the procedural requirements of the APA, unlawfully discriminates against applicants on the basis of national origin, and is in excess of Defendants' authority. *See generally* FAC; *see also* Dkt. 9-1. Whichever way the argument is framed, Plaintiffs' essential argument is the same: USCIS's indefinite hold under PM-0192 on final adjudication of immigration benefit applications by aliens from certain countries is not lawful. Plaintiffs are likely to succeed on one or more of the claims they base on this argument.

#### a. Claim 1 (writ of mandamus) and Claim 2 (APA duty to act)

Plaintiffs' first cause of action invokes the Court's mandamus power under 28 U.S.C. § 1361 "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Plaintiffs' second cause of action is brought under the APA, under which a court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Both of these statutory schemes provide avenues for relief that are "essentially the same," and thus the Court need not engage in a separate evaluation of Plaintiffs' likely success on the first and second causes of action. *See Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (declining to engage in separate analysis of claims under 28 U.S.C. § 1361 and

APA); *Wang*, 550 F. Supp. 2d at 1257-58 (same). Therefore the Court focuses on Plaintiffs' claim seeking relief under the APA for Defendants' alleged withholding and/or delay in connection with their I-485 and I-765 applications. *See Independence Min. Co.*, 105 F.3d at 507.

### i.    Mandatory duty to act

Under section 706(1) of the APA, a plaintiff must identify a "*discrete* agency action" that the agency is legally "*required* to take." *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 64 (2004) (emphasis in original). As discussed in greater detail in section II.B. above, 8 U.S.C. § 1255(a) provides that the status of certain aliens "may be adjusted by the Attorney General, in [her] discretion and under such regulations as [she] may prescribe, to that of an alien lawfully admitted for permanent residence" if the alien applies for such adjustment and other requirements are satisfied. The regulations concerning adjustment of status require that the applicant "be notified of the decision" on his or her application for adjustment of status "and, if the application is denied, the reasons for the denial." 8 C.F.R. § 245.2(a)(5)(i). Courts have concluded that this regulation establishes a "mandatory duty to act" on Form I-485 applications for adjustment of status. *See Singh v. Still*, 470 F. Supp. 2d 1064, 1067 (N.D. Cal. 2007); *Wang,* 550 F. Supp. 2d at 1258.

As also discussed in section II.B. above, the filing of a Form I-485 application for adjustment of status does not by itself authorize employment, and applicants for adjustment of status therefore need to apply for employment authorization. *See* 8 CFR 274a.12(c)(9). A footnote in PM-0194 (the second Policy Memorandum issued on January 1, 2026) acknowledges this relationship between Forms I-485 and I-765, stating that "when USCIS approves an individual's Form I-485, any associated or underlying applications, such as Form I-765, will be automatically terminated, as the benefit provided by the ancillary form is no longer necessary." PM-0194 at 5 n.17. Defendants admit that Plaintiffs' Form I-765 applications for employment authorization are "ancillary" to their Form I-485 applications. Dkt. 21 at 7. Defendants further admit that final adjudication of both sets of applications by Plaintiffs is on hold pursuant to PM-0192. *Id.*

In their opposition to the motion for preliminary injunction, Defendants attempt to argue that there is no duty to decide adjustment of status applications. *See* Dkt. 21 at 9. Instead, they

19

argue that "adjustment of status is a discretionary decision pursuant to 8 U.S.C. § 1255 that is unreviewable by a court." *Id.* (citing *Patel*, 596 U.S. at 347). The Court has already analyzed and rejected this argument. *See* section III.A. above. As explained, although Defendants have discretion as to whether to grant or deny particular applications for immigration benefits, they do not have discretion to indefinitely and categorically delay or withhold adjudication of such applications. *See Singh*, 470 F. Supp. 2d at 1067 ("there is a difference between the [agency's] discretion over *how* to resolve an application and the [agency's] discretion *whether* it resolves an application" (emphasis in original)).

### ii. Unreasonable delay

Having established that Defendants have a duty to decide their Form I-485 and ancillary Form I-765 applications, Plaintiffs argue that they are entitled to relief under 5 U.S.C. § 706(1) because Defendants have unreasonably delayed a decision on their applications and because Defendants' implementation of PM-0192 amounts to an unlawful withholding of adjudication of those applications. Dkt. 9-1 at 7-12; *see also* FAC ¶¶ 81-107.

"The distinction between agency withholding and delay is important." *See Al Otro Lado v. Exec. Off. for Immig. Rev.*, 138 F.4th 1102, 1120-21 (9th Cir. 2025), *cert. granted sub nom. Noem v. Al Otro Lado*, No. 25-5, -- S. Ct. -- , 2025 WL 3198572 (Mem) (Nov. 17, 2025).[5] As the Ninth Circuit explained in *Al Otro Lado*, claims under 5 U.S.C. § 706(1) for unreasonable delay are analyzed under a different framework than claims for unlawful withholding. "If an agency withholds a required action, it violates § 706(1) regardless of its reason for doing so" but "if an agency delays a required action, it violates § 706(1) only if the delay is unreasonable," which is a "fact-intensive inquiry analyzed under 'the so-called *TRAC* factors'" set forth in *Telecomms. Rsrch. & Action Ctr. v. FCC,* 750 F.2d 70, 79-80 (D.C. Cir. 1984). *Id.* at 1121 (internal quotation marks and citations omitted).

---

[5] The issue presented in the Petition for Certiorari in *Al Otro Lado* did not concern the unreasonable delay/withholding issue but was instead "[w]hether an alien who is stopped on the Mexican side of the U.S.–Mexico border 'arrives in the United States' within the meaning of the Immigration and Nationality Act, 8 U.S.C. 1101 et seq., which provides that an alien who 'arrives in the United States' may apply for asylum and must be inspected by an immigration officer."

Turning first to Plaintiff's claim that Defendants have unreasonably delayed a decision on their applications for immigration benefits, the Court must evaluate the *TRAC* factors: (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health or welfare is at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed. *See Independence Mining Co.*, 105 F.3d at 507 n.7 (citing *TRAC,* 750 F.2d at 80).

On the first *TRAC* factor, Defendants argue that the relevant immigration applications are decided in the order they are received. *See* Dkt. 21 at 16. A first-in, first-out (FIFO) procedure for processing applications can constitute a rule of reason. *See, e.g., Ray v. Cuccinelli*, No. 20-cv-06279-JSC, 2020 WL 6462398, at *9 (N.D. Cal. Nov. 3, 2020). Here, however, even if USCIS at some point processed Form I-485 and Form I-765 applications on a FIFO basis, the agency's implementation of PM-0192 changed the process by placing a hold on the final adjudication of applications submitted by applicants from certain countries. *See* Dkt. 8-1; *see also* Dkt. 21 at 21 ("PM-602-0194 expressly defines a 'hold' to allow 'a case to proceed through processing up to final adjudication' such that if 'a hold is in place, the case can continue to move forward until it is ready for a decision,' with only the decision deferred" (citing PM-602-0194 at 2 n.2)). Defendants' brief refers to a "line" of applicants (Dkt. 21 at 18, 22), but they have presented no evidence of how the supposed "line" operates now that many applications are now on hold under PM-0192. It appears that if and when Plaintiffs receive final adjudication of their applications, it will be *after* some later-filed applications submitted by applicants from other countries that are not on hold. Thus, whatever FIFO process may have once existed is no longer in place. This factor favors Plaintiffs.

The second *TRAC* factor considers whether Congress provided in the enabling statute a

21

timetable or other indication of the speed with which it expects the agency to proceed. On this factor, Plaintiffs point to 8 U.S.C. § 1571(b), which provides that "[i]t is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application . . . " Dkt. 9-1 at 10-11. Section 1571 does not establish a "mandatory timeline" regarding the adjudication of the immigration benefit applications at issue here, but "Congress [set] a normative expectation in [the statute] of a reasonable processing time for an immigrant benefit application as no more than 180 days after initial application." *Konchitsky v. Chertoff*, No. C07-00294 RMW, 2007 WL 2070325, at *4 (N.D. Cal. July 13, 2007); *see also Ray*, 2020 WL 6462398, at *8. Plaintiffs' applications had been pending for more than 180 days when they filed suit and have now been pending for nearly 9 months, thus exceeding the "normative expectation" concerning the decision timeline.

In addition, "[w]hile it is true that no specific timeline applies to processing of I-485 applications [] defendants clearly have to process the applications without unreasonable delay." *Konchitsky*, 2007 WL 2070325, at *4 (citing 5 U.S.C. § 555(b) ("With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.") and 5 U.S.C. § 706)). Plaintiffs present evidence from the USCIS website that as of December 11, 2025, approximately 80 percent of cases like theirs, which involve a Form I-765 based on a pending Form I-485, were completed within four months. Ex. C to FAC (Dkt. 8-3). This would be within and consistent with the "normative expectation" of processing within 180 days. Defendants point to the results of a different search on the USCIS website that reflects a processing time of 11 months for "employment-based" Form I-485 applications generally. Dkt. 21 at 17. Plaintiffs offer a persuasive explanation of why their estimate more closely aligns with the manner in which their applications were filed and is more accurate. *See* Dkt. 22 at 10-11. In any event, whether a normative or average processing time is usually 180 days, 4 months, or 11 months is of limited relevance given that under PM-0192, final adjudication of Plaintiffs' benefit applications is on indefinite hold. This factor favors Plaintiffs.

The third and fifth *TRAC* factors overlap and are often addressed together. *See Independence Mining*, 105 F.3d at 509. Courts have held that delay in processing immigration

22

status applications affects interests involving health and welfare. *See Singh*, 470 F. Supp. 2d at 1069. Among other things, a delay in an applicant's ability to obtain permanent resident status, as Plaintiffs seek by way of their Form I-485 applications, "affects a wide range of important rights, including but not limited to travel and the ability [to] petition to immigrate close family members" and also impacts such applicants' "ability to seek United States citizenship and all the rights and privileges attendant thereto." *Id.* at 1070. Such prejudice is "substantial." *Id.* at 1071. Some courts in this District have required plaintiffs asserting delayed adjudication to show more than "general harm experienced by all [] applicants." *Kullab v. U.S. Dep't of Homeland Security*, No. 24-cv-04140-WHO, 2025 WL 901943, at *7 (N.D. Cal. Mar. 25, 2025). Even if such a showing is required, Plaintiffs here satisfy the requirement. They have been separated from family members for years as their status remains unresolved. *See, e.g.*, Dkt. 9-2 ¶ 15. As discussed in more detail in section III.B.2. below concerning irreparable harm to Plaintiffs, they suffer substantial prejudice from the delay in processing their applications that extends beyond mere economic harm from loss of employment; the delay imperils their very ability to pursue their chosen professions in ways that do not apply to all applicants. Understandably, the uncertainty regarding their immigration status in light of fast-approaching deadlines by which they must take steps to continue or advance in their professions has also caused Plaintiffs emotional strain. Dkt. 9-2 ¶ 14. Moreover, a delay in the decision regarding Plaintiffs' immigration status not only impacts their personal health and welfare but also impacts this country's health and welfare more broadly given Plaintiffs' medical training and desire to work as physicians in the United States. These factors favor Plaintiffs.

On the fourth *TRAC* factor, which concerns the effect of expediting delayed action on Plaintiffs' applications on agency considerations of a higher or competing priority, Defendants argue that "[b]y demanding immediate adjudication, Plaintiffs effectively ask this Court to leapfrog them ahead of other applicants—including those applicants from the same countries who have been waiting longer than Plaintiffs." Dkt. 21 at 18. Defendants also suggest that granting Plaintiffs' requested relief will "foster[s] a pernicious incentive structure for filing unreasonable-delay suits." *Id.* But as discussed above, Defendants claim that prior to USCIS's adoption of PM-0192, immigration benefit applications were processed on a FIFO basis, and Plaintiffs have

provided evidence indicating that the average processing time of Form I-765 applications such as theirs is approximately four months. Plaintiffs' applications had been pending for more than six months at the time they filed this litigation. If the Court infers from the record before it what the "line" of applicants looked like, it is likely that Plaintiffs were towards the front. After PM-0192 was issued on December 2, 2025, Plaintiffs were taken out of line at the final adjudication step. In the meantime, applicants from countries not subject to PM-0192 are the ones who have been allowed to "leapfrog" in front of Plaintiffs as those third parties' applications continue to be processed through final adjudication. Although PM-0192 refers to issuance of a prioritized list within 90 days of December 2, 2025 (Dkt. 8-1 at 3), one would expect (given the national security concerns invoked in PM-0192) that review of applicants who present specific national security concerns would take the highest priority. If, in fact, Plaintiffs do not present such national security concerns, they will fall behind yet another group of applicants in processing. Thus, Defendants' implementation of the adjudicatory hold of PM-0192 has disrupted any "line" that existed, and Defendants have failed to offer any suggestion for a fairer way to place Plaintiffs back in the line for processing. Under these circumstances, Defendants have failed to demonstrate that expediting delayed action on Plaintiffs' applications will undermine agency considerations in maintaining a cognizable "line" of applicants.

Elsewhere in their opposition to the motion for preliminary injunction and in PM-0192 itself, Defendants reference national security considerations. *See, e.g.,* Dkt. 21 at 12; Dkt. 8-1. Although national security is an important priority, "the mere invocation of national security is not enough to render agency delay reasonable per se." *Singh*, 470 F. Supp. 2d at 1069. In *Singh*, the Government had identified national security concerns specific to that plaintiff, but the court nevertheless held that "the effect of expediting this matter upon the agency's 'activities of a higher [or] competing priority' appear to be limited." *Id.* at 1070. Defendants' invocation of national security concerns is even less salient in the context of Plaintiffs in this case, who have been living and working in the United States since 2023 and about whom Defendants have identified no specific national security concerns. As the court explained in *Wang*, in which the plaintiff (Wang) in an unreasonable delay case had been living and working in the United States for years: "If

Wang presents a threat to national security and public safety, the Government does not ameliorate that threat by delaying a decision on his I-485 application." 550 F. Supp. 2d at 1260. The same is true here, where Defendants have not identified any national security justification for further delaying action on Plaintiffs' applications. This factor favors Plaintiff.

On the sixth *TRAC* factor, Plaintiffs have not at this time made any allegation of agency impropriety. *See* Dkt. 9-1 at 12.

The *TRAC* factors therefore weigh in favor of Plaintiffs' contention that Defendants' delay in processing their applications for immigration benefits is unreasonable. Defendants point out that Plaintiffs' applications have not been pending as long as other cases in which courts have found unreasonable delay. *See* Dkt. 21 at 14-15. Most of the cases cited by Defendants involved routine processing delays, not an agency policy that places applications on a formal adjudication hold. *See Khachutorov v. Britten,* 792 F. Supp. 3d 1106 (C.D. Cal. 2025); *Shihuan Cheng v. Baran,* No. CV 17-2001-RSWL-KSX, 2017 WL 3326451 (C.D. Cal. Aug. 3, 2017). In the one case cited by Defendants on this quantitative point that involved a hold on an application (while waiting to see if USCIS extended its exemption authority to cover the plaintiff), the court found on summary judgment that a five-year delay was unreasonable not because it exceeded a particular quantitative threshold but because the Government had provided "no evidence regarding the likelihood of an exemption in the future or how rendering a decision would affect or challenge USCIS policies." *Querishi v. Napolitano*, No. C-11-cv-05814-YGR, 2012 WL 2503828, at *7 (N.D. Cal. June 28, 2022). "Defendants cannot hold the Application indefinitely" and "[e]ven if Plaintiff could receive an exemption in the future, it is also possible he will never receive one." *Id.* As Defendants describe *Querishi,* the court held that the delay "due to USCIS policy hold was unreasonable where [there was] no indication of when the plaintiff could anticipate adjudication of [his] petition." Dkt. 21 at 14-15. Plaintiffs in this case are in the same situation.

Moreover, decisions condoning years-long delays "cannot be squared" with the principles that "(i) immigration-benefit applications should generally be processed not later than 180 days after the initial filing of the application, 8 U.S.C. § 1571(b); (ii) a reasonable time for agency action is typically counted in weeks or months, not years; and (iii) determining whether a delay is

25

unreasonable is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Raju v. Cuccinelli*, No. 20-cv-01386-AGT, 2020 WL 4915773, at *2 (N.D. Cal. Aug. 14, 2020) (internal quotation marks and citations omitted).

The particular facts and circumstances of this case are that although the past delay in processing Plaintiffs' applications is currently approximately nine months, that processing is now on formal hold under PM-0192 and there is no discernable end point to the future delay. PM-0192 refers to a prioritized list to be completed by USCIS within 90 days of the issuance of the Policy Memorandum (Dkt. 8-1 at 3), but Defendants have been unable to explain how this event will impact the adjudication hold. When the Court asked the Government to explain what the "prioritized list for review" is, defense counsel stated: "I don't know about that, your Honor. I'm not sure what that would be. We would have to – my understanding is that we would wait until March to understand that further." Dkt. 34 (2/10/26 Hrg. Tr.) at 10:2-5; *see also id.* at 10:6-9 (response by defense counsel to question about whether she had any information about how the prioritized list would be used or how it would impact the process: "I don't, your Honor"). Similarly, Government counsel referred to an expectation of "guidance" within 90 days of issuance of PM-0192 but could not identify what type of guidance is expected or from whom. *Id.* at 8:21-25 ("So applications that are subject to this hold would still go through all of those processes, until they are ready for the final decision, and then that's where they would be held, and then we're looking for further guidance as to kind of what to do at that point"). Moreover, PM-0192 links the adjudication hold to the planned "comprehensive review of all policies, procedures, and guidance," which could be a lengthy process. Dkt. 8-1 at 2.

For the reasons discussed, the Court concludes that Plaintiffs are likely to prevail on their unreasonable delay claim.

### iii.    Unlawful withholding

Even if Defendants' reasons for delaying adjudication of Plaintiff's immigration benefit applications were reasonable, "[i]f any agency withholds a required action, it violates § 706(1) regardless of its reason for doing so." *Al Otro Lado*, 138 F.4th at 1121. In *Al Otro Lado*, the Ninth Circuit concluded that the absence of a statutory deadline for agency action does not

preclude a finding that the agency has withheld the required action. *Id.* The Ninth Circuit held that "when an agency refuses to accept, in any form, a request that it take a required action, it has 'withheld' that duty within the meaning of § 706(1)." *Id.* at 1122. The court explained:

> Our interpretation of the difference between withholding and delay in § 706(1) comports with the ordinary meaning of those terms. When an action is delayed, one expects that, with the passage of time (maybe even an unreasonable amount of time), the action eventually will be completed. By contrast, when an action has been withheld, no amount of waiting can be expected to change the situation. With patience, one can wait out delay, but even with superhuman patience, one cannot wait out withholding.

*Id.* at 1122.

To be sure, in this case Defendants did not refuse outright to accept Plaintiffs' Form I-485 and I-765 applications. However, Defendants admit that under PM-0192, final adjudication of the applications is on hold. Defendants have failed to explain when and by what criteria a decision will be made to lift the hold.

Because the Court has already concluded that Plaintiffs are likely to succeed on Claim 2 under 5 U.S.C. § 706(1) on a theory of unreasonable delay, it does not further analyze their claim for unlawful withholding under that section.

### b. Claim 3 (APA arbitrary and capricious) and Claim 4 (APA rulemaking process)

The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. Under 5 U.S.C. § 706(2), a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; [or] (D) without observance of procedure required by law[.]" Plaintiffs' third and fourth causes of action allege that USCIS's promulgation and implementation under PM-0192 of a hold on the adjudication of all pending benefit requests for aliens from certain countries was arbitrary and capricious and failed to comply with notice-and-comment procedures. FAC ¶¶ 108-120; *see also* Dkt. 9-1 at 12-14. Plaintiffs are likely to succeed on both causes of action.

### i. Final agency action

Plaintiffs do not claim that PM-0192 is reviewable by statute, so the threshold question on whether the Court may review that Policy Memorandum is whether it constitutes "final agency action." *See Amer. Federation of State County and Municipal Employees, AFL-CIO v. United States Office of Management and Budget*, -- F. Supp. 3d --, 2025 WL 3018250, at *15 (N.D. Cal. Oct. 28, 2025); *also* 5 U.S.C. § 704. Both sides agree that under the operative legal test, an agency action is final only if it is: (1) the consummation of an agency's decision-making process, and (2) an action by which rights or obligations have been determined or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also* Dkt. 21 at 19; Dkt. 22 at 13. The Supreme Court has long taken a "pragmatic" approach to determining whether an agency action is final. *San Francisco Housing Ass'n v. Dep't of the Interior,* 946 F.3d 564, 578 (9th Cir. 2019) (quoting *U.S. Army Corps. of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

Defendants argue that PM-0192 is not a "final agency action." Dkt. 21 at 19-21. On the first prong under *Bennett*, Defendants argue that PM-0192 is not the consummation of a decision-making process but instead "merely advises 'the public of the agency's construction of rules which it administers.'" Dkt. 21 at 20 (quoting *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015). This argument is difficult to reconcile with the structure and the language of PM-0192. The Policy Memorandum does not purport to interpret existing rules but instead creates new rules and procedures. Specifically, PM-0192 imposes new procedures applicable to benefit applications from aliens from the specified countries including "a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." Dkt. 8-1 at 1*; see also id.* at 3 (identifying four issues to be reviewed "on a case-by-case basis to assess benefit eligibility"). PM-0192 also announces a new effort by USCIS to "conduct a comprehensive review of all relevant policies, procedures, and operational guidance for compliance, accuracy, and needed improvements during this time. *Id.* at 1-2. Most importantly for the purposes of the present motion for preliminary injunction, PM-0192 unambiguously places an indefinite hold on final adjudication of all pending benefit applications

1  for aliens from a list of countries including Iran. *Id.* at 1.

2      Defendants point to provisions in the memorandum that anticipate the issuance of

3  operative guidance within 90 days and state that the hold on adjudications may be "lifted or

4  modified by the USCIS Director through a subsequent memorandum" in support of their argument

5  PM-0192 is only an interlocutory, non-final agency action. Dkt. 21 at 20; *see also* Dkt. 8-1 at 2-3.

6  However, "a number of cases support the proposition that significant pauses and blanket moratoria

7  are final agency actions that cannot be exempted from judicial review merely by being

8  characterized as intermediate." *Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D. Mass. 2025)

9  (citing cases). For example, in the immigration context, a memorandum issued by the Department

10 of Homeland Security that called for a department-wide review of policies and practices

11 concerning immigration enforcement and ordered an immediate 100-day pause on the removal of

12 any noncitizen with a final order of removal was held to meet the *Bennett* criteria for final agency

13 action, notwithstanding that the Secretary retained the discretion to change or abandon the

14 nonenforcement policy at any time. *Texas v. United States*, 524 F. Supp. 3d 598, 642 (S.D. Tex.

15 2021).

16     Defendants argue that PM-0192 fails to satisfy the second prong of the *Bennett* test for

17 determining whether an agency action is final because "no alien applicants' rights or obligations

18 have been determined, and USCIS personnel are not directed to take actions for which legal

19 consequences flow." Dkt. 21 at 21. The premise of this argument is that processing of an

20 application subject to PM-0192 may continue "until it is ready for a decision, with only the

21 decision deferred." *Id.* (citation omitted). Defendants illustrate this point by a declaration

22 submitted by the Director of the USCIS San Jose Field Office stating that in this case, "USCIS is

23 continuing to process Plaintiff's [sic] applications, following all statutes, regulations, policies, and

24 procedures" and that USCIS recently scheduled and held interviews of Plaintiffs. *Id.*; *see also*

25 Dkt. 21-1 ¶¶ 5-6. However, as admitted in Defendants' opposition brief and as explained in PM-

26 0194, the adjudicatory hold put in place in PM-0192 prevents final adjudication of Plaintiffs'

27 applications, *i.e.,* a final decision on whether to approve, deny, or dismiss their applications.

28 Dkt. 21 at 21; PM-0194 at 1 n.2.

As a result, PM-0192 affects Plaintiffs' rights. As discussed in more detail in section III.B.2. below, without final adjudication of their Form I-485 or Form I-765, Plaintiffs cannot maintain employment and continue their professional progress. "Courts have regularly determined that [the second prong of the finality test] is satisfied when an indefinite pause is imposed by an agency." *New York v. Trump*, -- F. Supp. 3d --, 2025 WL 3514301, at *9 (D. Mass. 2025) (citing cases and holding that 60-day pause in issuance of wind energy authorizations pending assessment of federal wind leasing and permitting practices was a final agency action); *see also Doe v. Trump*, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017) (holding that memorandum issued by agencies including DHS that suspended for at least 90–days the entry of refugees who are nationals of or residents of certain countries was a final agency action because "whether the Agency Memorandum produces a 'suspension' or an indefinite delay, [it] has significant real-world impacts on Plaintiffs' various situations."). "[E]ven short delays can have cascading effects" on applicants. *Doe v. Trump*, 288 F. Supp. 3d at 1070. Here, similarly, it does Plaintiffs little practical good if some processing of their applications continues if USCIS places an indefinite hold on any decision on the applications. Here, "[the agency's] position was definitive and the legal consequences for [Plaintiffs] were real," which are "the hallmarks of APA finality." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 581 (2019) (citations omitted).

Plaintiffs are likely to succeed in showing that PM-0192 is a final agency action for purposes of their third and fourth causes of action for violation of the APA.

Defendants have not offered any other arguments on the merits of Plaintiffs' third and fourth causes of action. The Court nevertheless will consider the elements of both causes of action in assessing Plaintiffs' likelihood of success.

### ii. Arbitrary and capricious

Plaintiffs' third cause of action alleges that Defendants' decision to withhold adjudications pursuant to PM-0192 was arbitrary and capricious. FAC ¶¶ 108-111. Plaintiffs argue that they are likely to succeed on this point because "Defendants did not acknowledge, let alone meaningfully consider, the reliance interests of Form I-765 and Form I-485 applicants harmed by their actions" nor did they "acknowledge the harm done to the United States in preventing physicians in the

United States from practicing medicine in the United States." Dkt. 9-1 at 12-13. The Court agrees.

As noted above, the APA authorizes courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The touchstone of arbitrary and capricious review under the APA is reasoned decisionmaking." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (internal quotation marks and citations omitted). "That means an agency's action can only survive arbitrary or capricious review where it has articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks and citations omitted). "[I] f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the agency's decisionmaking is insufficiently reasoned. *Id.* at 492 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Important aspects that the agency must consider include "the costs as well as the benefits" of the agency action. *State Farm*, 463 U.S. at 54.

The background section of PM-0192 states that "[r]ecently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people," citing two incidents of violence in 2024 and 2025 that involved Afghan nationals. Dkt. 8-1 at 2. PM-0192 explains that "[i]n light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 [and possibly outside this timeframe] is necessary." *Id.* The Policy Memorandum further explains that "[t]o assess vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudication hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk

31

countries outlined in PP 10949." *Id.* PM-0192 states that the hold will remain in effect "until lifted by the USCIS Director through a subsequent memorandum." *Id.* at 2-3. Plaintiffs' arbitrary and capricious claim focuses on the hold component of PM-0192 rather than other portions of the Policy Memorandum that anticipate implementation of new re-review processes and a comprehensive review of all policies, procedures, and guidance. *See* FAC ¶ 11; Dkt. 8-1 at 2. It is undisputed that by placing a hold on final adjudication of immigration benefit applications from applicants from the countries that are subject to PM-0192, the USCIS departed from its existing policies.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). At a minimum, an agency that "changes its existing position" must "display awareness that it is changing position and show that there are good reasons for the new policy.'" *Id.* (internal quotation marks and citation omitted). An agency undertaking "policy change" must also provide "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Id.* at 222 (citation omitted). "[A]n unexplained inconsistency in agency policy is a reason for holding [a new action] to be an arbitrary and capricious change from agency practice." *Id.* (citation omitted).

Arguably, the USCIS "displays awareness that it is changing position" when it states in PM-0192 that the agency "has considered that this direction may result in delay to the adjudication of some pending applications …" Dkt. 8-1 at 3. However, the agency must also provide a "reasoned explanation" for disregarding "serious reliance interests" stemming from the prior policy. *Encino Motorcars*, 579 U.S. at 222. The agency must also show consideration of "alternatives … within the ambit of the existing policy." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted). Defendants have failed to show that these requirements are satisfied.

PM-0192 states that USCIS has "weighed that consequence [from delayed adjudication of some pending applications] against the urgent need for the agency to ensure that applicants are

32

vetted and screened to the maximum degree possible" and "[u]ltimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve national security." Dkt. 8-1 at 3. This language is merely conclusory and as such provides no explanation as to how USCIS "weighed" the competing factors and "determined" that the burdens imposed by the hold are necessary. It provides no indication that the agency actually considered the consequence of indefinitely delaying final adjudication of pending applications. For example, and as also discussed in section III.B.2. below, Plaintiffs have presented evidence that in reliance on the prior policy, they legally came to the United States, obtained employment, undertook research projects, took exams, and engaged in other steps necessary to achieve their long-term goals of practicing medicine in this country. *See generally* Dkt. 9-2, 29-1, 29-2. Nowhere does PM-0192 reflect that the agency considered the professional and other consequences and burdens imposed on applicants such as Plaintiffs.

Notably, the hold component of PM-0192 goes far beyond EO 14161 and the Proclamation that PM-0192 purported to implement. Both EO 14161 and the Proclamation focused on restricting the *entry* of aliens from 19 countries deemed to be high-risk, reciting the President's authority under INA 212(f) to suspend or restrict the entry of aliens from 19 high-risk countries. Dkt. 24-1 at CAR000015-CAR000017; CAR000018-CAR000026. But the adjudicatory hold extends far beyond that context because it applies to nearly all pending benefit requests from applicants such as Plaintiffs *who have already been admitted to the United States*. *See* Dkt. 8-1 at 1. There is no evidence that Defendants considered reasonable alternatives to the expansive hold policy. *See AIDS Vaccine Advoc. Coalition v. United States Dep't of State*, 766 F. Supp. 3d 74, 82 (D.D.C. Feb. 13, 2025) ("Defendants have not offered any explanation for why a blanket suspension of all congressionally appropriate foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs.").

Defendants' failure to address the merits of Plaintiffs' argument on their arbitrary and capricious claim leaves the Court to speculate that *if* Defendants had offered an explanation for

their hold policy, it might be to the effect that without a hold, USCIS could approve pending applications from individuals who later turn out to present national security concerns. But as Courts in the Ninth Circuit have recognized, in that scenario the Government is not left without a remedy. *See Singh*, 470 F. Supp. 2d at 1070 ("should facts become known to [the Government] that [the I-485 applicant] is in fact a national security threat" the government "always [has] the option of moving to rescind the grant of residency or initiate removal proceedings"); *Wang*, 550 F. Supp. 2d at 1260 ("If the Government granted [the alien's] application for adjustment of status, it would retain a panoply of options in the event that it discovered that [he] posed a threat to national security," such as arrest or deportation"). As noted in *Wang*, if the Government is concerned about public safety and national security, particularly with respect to applicants already in the United States, it should find a way to process adjustment of status applications more quickly "thereby revealing threats to security more quickly." *Wang,* 550 F. Supp. 2d at 1260. Defendants have offered no evidence that they considered such alternatives to the adjudicatory hold policy.

Plaintiffs are likely to succeed on their claim that the adjudicatory hold component of PM-0192 is arbitrary and capricious and must therefore be set aside under the APA.

### iii.    Observance of procedure required by law

Plaintiffs' fourth cause of action alleges that PM-0192 was adopted without following required procedures. FAC ¶¶ 112-120. "Under the APA, a federal administrative agency is required to follow prescribed notice-and-comment procedures before promulgating substantive rules." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009). The requisite procedures include publishing notice of proposed rules in the Federal Register and then allowing interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments. *See* 5 U.S.C. § 553. "These procedures are designed to assure due deliberation of agency regulations and foster the fairness and deliberation that should underlie a pronouncement of such force." *East Bay Sanctuary Covenant v. Trump,* 932 F.3d 742, 775 (9th Cir. 2018) (internal quotation marks and citations omitted).

Rules are "substantive," and therefore subject to the APA's notice-and-comment requirements, if they "create rights, impose obligations, or effect a change in existing law pursuant

to authority delegated by Congress." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir. 1994). In the area of immigration policy, "[c]ourts require agencies to engage in notice and comment rulemaking when implementing policy changes with substantive consequences for refugees and other immigrants." *Doe v. Trump*, 288 F. Supp. 3d at 1073 (on motion for preliminary injunction, finding that plaintiffs were likely to succeed on claim that agencies should have engaged in APA rulemaking before issuing a memorandum that (1) indefinitely suspended certain refugees from entering the United States, and (2) suspended for at least 90–days the entry of refugees who are nationals of, and stateless persons who last habitually resided in, 11 particular countries that had been identified as posing a higher risk to the United States).

As discussed in section III.B.1.b.i. above, the policy changes set forth in PM-0192 have substantive consequences for immigrants. Defendants' argument that PM-0192 is not a final agency action tacitly concedes that notice-and-comment procedures were not followed before promulgating the PM-0192, *see* Dkt. 21 at 20, and Defendants do not directly address Plaintiffs' claim that the agency was required to follow those procedures. Defendants also fail to invoke any of the exceptions to the notice-and-comment procedures, such as the exceptions for interpretative rules, general statements of policy, and rules of agency organization, procedure or practice. *See* 5 U.S.C. § 553(b)(4)(A). To the extent Defendants' argument that PM-0192 is not a final agency action is intended to suggest that PM-0192 is not a substantive rule subject to notice-and-comment procedures, that argument fails for the reasons discussed in section III.B.1.b.i. above

Accordingly, the Court concludes that Plaintiffs are likely to succeed on their third and fourth causes of action for violation of the APA.

        **c.**      **Other Claims: Claim 5 (national original discrimination under INA); Claim 6 (violation of Fifth Amendment Equal Protection); and Claim 7 (*ultra vires*)**

The Court has already concluded that Plaintiffs are likely to succeed on their first through fourth causes of action. Plaintiffs "do[] not need to show a likelihood of success on *every* claim in order to obtain a preliminary injunction." *Museum of Handcar Tech. LLC v. Transportation Agency for Monterey Cnty.*, 778 F. Supp. 3d 1065, 1079 (N.D. Cal. 2025) (emphasis in original), *vacated in part on other grounds*, No. 24-CV-08598-EKL, 2025 WL 1810265 (N.D.

Cal. June 30, 2025).   Nevertheless, the Court briefly addresses Plaintiffs' remaining causes of action.

Plaintiffs' fifth and sixth causes of action allege that by subjecting Plaintiffs' applications for immigration benefits to different procedures than other applications based solely on Plaintiffs' country of origin, PM-0192 discriminates on the basis of national origin in violation of the INA, 8 U.S.C. § 1152(a)(1)(A), and the Equal Protection component of the Fifth Amendment. FAC ¶¶ 121-128.  8 U.S.C § 1152(a)(1)(A) provides that with limited exceptions, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."  Meanwhile, the Fifth Amendment "'contains an equal protection component prohibiting' the federal government from engaging in invidious discrimination against persons in the United States" that applies to "all persons within the territorial jurisdiction [of the United States, without regard to any differences … of nationality and even if their "presence in this country is unlawful, involuntary, or transitory."  *Miot,* 2026 WL 266413, at *30 (quoting *Washington v. Davis,* 426 U.S. 229, 239 (1976), *Yick Wo v. Hopkins*, 118 U.S. 336, 369 (1886), and *Mathews v. Diaz*, 426 U.S. 67, 77 (1976)).

The FAC alleges facts concerning the elements of Plaintiffs' discrimination-related claims, *id.*, and Plaintiffs address those elements in their briefing on the motion for preliminary injunction, *See, e.g.,* Dkt. 8 ¶¶ 121-128; Dkt. 9-1 at 14-17.  On its face, PM-0192 treats different groups of applicants for immigration benefits differently based on their national origin. *See* Dkt. 8-1 at 1 (directing USCIS personnel to "[p]lace a hold on pending benefit requests for aliens from countries listed in" the Proclamation).  Defendants have not addressed or rebutted Plaintiffs' showing on these claims.  Moreover, although "the Government may treat people differently if it has sufficient justification," *Miot*, 2026 WL 266413, at *30, Defendants have not addressed whether their purported justifications for the national origin discrimination set forth in PM-0192 meets Constitutional standards.

Plaintiffs' seventh cause of action alleges that Defendants acted *ultra vires* (in excess of their lawful authority) in enacting a policy of withholding adjudication of immigration

36

applications. FAC ¶¶ 129-133. Defendants' duty to adjudicate immigration applications, as well as limitations on their ability to withhold adjudication, are discussed at length above. Moreover, PM-0192 invokes the President's authority under section 212(f) of the INA (8 U.S.C. § 1182(f)) to "suspend or restrict the entry of any aliens deemed detrimental to U.S. interests." Dkt. 8-1 at 1 n.1. That authority to limit *entry* of aliens does not support issuance of PM-0192 to the extent the Policy Memorandum affects the ability of aliens, such as Plaintiffs, who have already been lawfully admitted to the United States. Defendants have not specifically addressed Plaintiffs' *ultra vires* claim.

Plaintiffs' unrebutted showing on their fifth through seventh causes of action demonstrates that they are likely to succeed on those claims as well.

### 2. Irreparable harm

Having concluded that Plaintiffs are likely to succeed on their claims, the Court must also consider whether they have shown that they are likely to suffer irreparable harm in the absence of a preliminary injunction. *Winter,* 555 U.S. at 20; *Cottrell*, 632 F.3d at 1135.

It is uncontested that unless and until Plaintiffs' status is adjusted to that of permanent residents, they need work authorization in order to work in the United States. Plaintiff Langroudi has shown that his current EAD expires on March 31, 2026, and after that time he will be unable to continue in his current position as a visiting instructor at Stanford Medical School or pursue new employment. Dkt. 29-2 ¶ 7. Plaintiff Varniab is currently employed by Stanford Medical School as a postdoctoral research fellow on a work authorization that is connected to her J-1 research visa, and that work authorization does not expire until September 30, 2026. Dkt. 29-1 ¶ 13. However, Varniab has shown that she is participating in Match Day on March 20, 2026 and that she has received credible indicia that her efforts to match with a residency program are likely to succeed. *Id.* ¶¶ 8-11. Her participation in Match Day is the culmination of a years-long process of preparation that has required years of time and tens of thousands of dollars. Dkt. 9-1 ¶ 10. Upon a successful match, she will be asked to sign an employment contract with the residency program within a matter of days or weeks from March 20. *Id.* ¶¶ 10-12; Dkt. 29-1 ¶ 13. At that point, she will need a new work authorization that differs from the one she currently holds.

Dkt. 29-1 ¶ 13. And she needs to complete a residency to pursue her chosen career path as a practicing radiologist. *Id.* ¶ 8.

Defendants—who possess extensive information about Plaintiffs not only from the materials Plaintiffs have filed in this case but also from various immigration benefit applications Plaintiffs have filed—do not dispute the factual underpinnings of Plaintiffs' irreparable harm argument: Langroudi's ability to work in his current position or begin a new position will end when his current work authorization expires at the end of March, and upon a successful match on March 20, 2026 Match Day Varniab will need a new work authorization within days or a few weeks. Defendants cavalierly dismiss these imminent harms. *See* Dkt. 34 (2/10/26 Hrg. Tr.) at 53:14-23 ("Plaintiffs don't explain why – for the residency match, why that couldn't happen next year, or whether there's another or a second match, or anything like that" and "as I said about the work authorization, other than the harm of not having the work authorization and not being able to work, Plaintiff didn't identify other harms, and our position is – the agency's position is that more is needed to meet that.").

As to Langroudi, although economic harm is generally insufficient to establish irreparable injury, the harm "extends beyond ordinary economic injury" where the plaintiffs "would not only suffer lost wages [but] would lose the legal ability to work at all," which would "implicate Plaintiffs' fundamental ability to earn a livelihood, support their families, and remain self-sufficient." *Miot*, 2026 WL266413, at *36. Langroudi "could not simply find another job, as [he] would be categorically barred from lawful employment." *Id.* Under the circumstances of this case, including Langroudi's showing of how loss of his authorization to work will negatively affect his own residency timeline and planned career path (Dkt. 29-2 ¶ 7), Langroudi's imminent loss of work authorization constitutes irreparable harm. *See id.*

Varniab has shown that she will likely lose the chance to pursue her chosen profession if her immigration benefit applications remain on hold because she will be unable to accept a medical residency following the March 20, 2026 Match Day. In the Ninth Circuit, the "loss of opportunity to pursue [one's] chosen profession[ ] constitutes irreparable harm." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, 781 F. Supp. 3d 920, 940–41 (N.D.

Cal. 2025), *appeal dismissed,* No. 25-1677, 2025 WL 2976744 (9th Cir. Sept. 29, 2025) (quoting *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). For example, in *Brewer*, the Ninth Circuit reversed the district court's denial of a preliminary injunction against the Arizona governor's executive order directing state agencies to prevent issuance of state identification including driver's licenses to DACA recipients, finding that the plaintiffs' ability to drive was "integral to their ability to work." 757 F.3d at 1068-69. The Ninth Circuit held that the plaintiffs had "introduced ample evidence that Defendants' policy causes them to suffer irreparable harm" by "limiting their professional opportunities." *Id.* at 1068; *see also Doe v. Samuel Merritt Univ.,* 921 F. Supp. 2d 958, 964 (N.D. Cal. 2013) (granting preliminary injunction against medical school policies that prevented disabled student from completing clinical rotations required to complete her degree, finding irreparable harm based on showing that policies were "precluding [the student] from advancing her professional career"); *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011) (affirming district court's grant of preliminary injunction requiring defendant to accommodate plaintiff's disabilities in administering the California Bar Exam in case brought under Americans with Disabilities Act); *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709-10 (9th Cir. 1988) (reversing denial of preliminary injunction because district court failed to consider irreparable harm if teacher was denied injunction reinstating him to classroom teaching position where alternative administrative position he was offered was distasteful to him, involved no student contact, and "does not utilize his skills, training or experience"). Thus, Varniab's showing regarding her inability to practice her chosen profession warrants a finding of imminent irreparable harm.

Although it is conceivable that Plaintiffs could take another path to their professional goals, Defendants have not identified such a path. In any event, a party can suffer irreparable harm despite the availability of alternative professional opportunities where they are "simply not the same" as the chosen profession. *Enyart*, 630 F.3d at 1166. Moreover, Varniab is irreparably injured even if she is able to delay her participation in Match Day to a later year because "[a] delay, even if only a few months, pending trial represents precious, productive time irretrievably lost." *Id.* (citation omitted).

Aside from the imminent and irreparable professional harm they face in the absence of a preliminary injunction, Plaintiffs have also presented evidence of other irreparable harm they will suffer if their applications remain frozen.  These harms include inability to travel to visit family, inability to make basic life decisions, and significant emotional strain.  *See, e.g.,* Dkt. 9-2 ¶¶ 13-15.

Therefore, both Plaintiffs have shown they will suffer imminent irreparable harm if Defendants continue to hold final adjudication of their Form I-765 applications for employment authorization filed in connection with their Form I-485 applications for adjustment of status. The Court cannot and does not order any particular outcome on Plaintiffs' applications.

### 3.    Balance of equities and public interest

District courts must "give serious consideration to the balance of equities and the public interest"—the third and fourth *Winter* factors—in considering a motion for preliminary injunction. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (quoting *Winter,* 555 U.S. at 27). In weighing the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).  Weighing the public interest, on the other hand, "primarily addresses impact on non-parties rather than parties."  *CTIA-The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 852 (9th Cir. 2019).  The Parties agree that where, as here, the Government is a party to a case, the balance of the equities and public interest factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also* Dkt. 9-1 at 19-20; Dkt. 21 at 22.

The preliminary injunction Plaintiffs seek is narrow:  they seek only a final adjudication of their own applications within 30 days of the Court's order.  They do not ask the Court to dictate a particular outcome on their applications, and the Court cannot and will not do so.

Defendants have not demonstrated that this narrow relief will cause any significant hardship to the Government.  Plaintiffs' applications have been pending for over nine months and their biometrics appointments and interviews have already taken place.  Even if any additional steps are required to finally adjudicate four applications for immigration benefits, there is no evidence that they will impose any significant burden on the Government.  Moreover, the second

USCIS Policy Memorandum (PM-0194) issued on January 1, 2026 identifies 10 categories of exceptions to the adjudication hold set forth in PM-0192, including an exception for "[b]enefit requests filed by aliens whose entry would serve a United States national interest," such as certain scientists and medical researchers.  PM-0194 at 5 and n.16.[6]  This indicates that there is a mechanism already in place to continue to process applications notwithstanding PM-0192.

To the extent Defendants' national security arguments bear on the balance of equities and the public interest, those arguments do not justify denial of a preliminary injunction.  As already discussed, Defendants have not identified any information specific to Plaintiffs that suggest they pose a threat to national security, and in any event, withholding final adjudication of their Form I-485 and Form I-765 applications while Plaintiffs are already in the country would not serve national security interests.  Because preliminary injunctive relief would be limited to Plaintiffs only, it can cause no more than a slight burden on the policy purposes behind PM-0192, especially given that PM-0194 has already created numerous exceptions to the adjudicatory hold.

Defendants have not demonstrated that granting a preliminary injunction to Plaintiffs would harm third parties.  Defendants raise concerns of fairness if Plaintiffs are allowed to "jump the line" and obtain adjudication of their applications before others can have their applications processed, but as discussed in section III.B.1.a.ii. above those concerns are overblown.

Meanwhile, as discussed in section III.B.2. above, Plaintiffs have demonstrated that they will suffer concrete, irreparable injury in the absence of an injunction.  The balance of hardships tips sharply towards Plaintiffs.

Viewing the public interest from a broader perspective, public health at large would not be served by denial of a preliminary injunction, which would leave applicants like Plaintiffs, who are trained medical professionals who want to practice medicine in this country, in immigration limbo while final adjudication of their applications for immigration benefits remains on indefinite hold. This uncertainty would likely deter similarly-situated medical professionals from trying to practice medicine here.

---

[6] Whether either Plaintiff falls within any of these exceptions to the adjudication hold cannot be determined based on the present record.

## IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction and **ORDERS** as follows:

1. Defendants and all of their respective officers, agents, servants, employees, attorneys, and any person in active concert or participation with them who receive actual notice of this Order are **ENJOINED** from applying the adjudication hold of the December 2, 2025 USCIS Policy Memorandum (PM-602-0192) to Plaintiffs' Form I-765, *Application for Employment Authorization*, and Forms I-48, *Application to Register Permanent Residence or Adjust Status* applications.

2. **Within 30 days of the date of this Order,** Defendants shall adjudicate Plaintiffs' Form I-765, *Application for Employment Authorization*, and Form I-485, *Application to Register Permanent Residence or Adjust Status* applications and inform Plaintiffs of the decision and, if denied, the reasons for denial.

3. Counsel for Defendants must provide written notice of this Order to all Defendants by **February 24, 2026 at 5:00 p.m. (Pacific Standard Time).** Defendants must file a copy of the notice on the docket at the same time.

4. The Court finds that a bond is not required under Federal Rule of Civil Procedure 65(c) because Defendants did not request a bond or submit any evidence that they are likely to suffer damages from the injunction. *See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

5. The Court will hold an in-person Case Management Conference on **March 24, 2026 at 10:00 a.m.** The Parties' Joint Case Management Statement is due by **March 17, 2026** and must address the status of

Defendants' compliance with this preliminary injunction in addition to the contents required under the Standing Order for All Judges of the Northern District of California regarding the contents of the Joint Case Management Statement.

**SO ORDERED.**

Dated: February 20, 2026

_Susan van Keulen_

SUSAN VAN KEULEN
United States Magistrate Judge